**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| IVANI, LLC<br>*Plaintiff,*<br>v.<br>LEGRAND NORTH AMERICA, LLC.<br>*Defendant.* | Civil Action No. 26-cv-3706<br><br>**<u>JURY TRIAL DEMANDED</u>** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff, Ivani, LLC ("Ivani") brings the following allegations and asserts the following claims against Defendant Legrand North America, LLC ("Legrand") for Legrand's infringement of U.S. Patent Nos. 9,843,194 and 10,418,824.

## NATURE OF THE ACTION

1. This is an action for willful direct and indirect infringement of Ivani's U.S. Patent Nos. 9,843,194 ("the '194 Patent") and 10,418,824 ("the '824 Patent") (collectively the "Asserted Patents"), in violation of the Patent Act, 35 U.S.C. § *1 et seq*., based on Legrand's unauthorized commercial making, use, offer for sale, sale, and importation of various Legrand master switches, remote switches, and controllers—including certain "kits" that sell the infringing switches and controllers as a unitary package.

## THE PARTIES

2. Plaintiff Ivani, LLC is a limited liability company incorporated under the laws of Delaware. Ivani is an operating company whose industry-leading technology is backed by its extensive patent portfolio, including over 100 granted patents, with additional patents pending. In addition to the mesh network technology in the Asserted Patents, Ivani is known for its sensify®

technology, software/firmware that turns ordinary IoT devices (e.g., lights, outlets, hubs) into advanced occupancy sensors by analyzing RF disturbances across existing wireless networks

3. Defendant Legrand North America, LLC is a limited liability company organized and existing under the laws of Delaware. Legrand North America, LLC's headquarters is located at 60 Woodlawn Street, West Hartford, Connecticut, 06610. Legrand maintains an additional Connecticut office located at 125 Eugene O'Neill Drive New London, Connecticut 06320.

**JURISDICTION AND VENUE**

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, 35 U.S.C. § 1 *et seq*.

5. Personal jurisdiction is proper over Legrand because it maintains a regular and established place of business in the Northern District of Texas at 2240 Campbell Creek Blvd., Suite 110, Richardson, TX 75208:


**Business Personal Property Account #99180403210000000**

**Property Location (Current 2027)**
**Address:** 2240 CAMPBELL CREEK BLVD
Suite: 110
**Mapsco:** 8-N (DALLAS)

DCAD Property Map

View Photo

2026 Appraisal Notice

Electronic Documents (DCAD ENS*)

Notice Of Estimated Taxes (ENS*)

* Electronic Notification System

**Owner (Current 2027)**
LEGRAND NORTH AMERICA LLC
ATTN PROPERTY TAX DEPT
STE 110
2240 CAMPBELL CREEK BLVD
RICHARDSON, TEXAS 750824433

**DBA:** WATTSTOPPER INC

6. As of this Complaint's filing date, Legrand advertised job opportunities in this state:


Production Supervisor
Richardson, TX, United States (On-site) • **POSTING DATE** 09/24/2026 • **JOB FAMILY** Manufacturing
BE THE FIRST TO APPLY

Account Executive
Dallas, TX, United States (Remote) • **POSTING DATE** 09/22/2026 • **JOB FAMILY** Sales

Financial Analyst
Richardson, TX, United States (Hybrid) • **POSTING DATE** 09/15/2026 • **JOB FAMILY** Finance
TRENDING

Field Service Engineer
Houston, TX, United States (On-site) • **POSTING DATE** 09/10/2026 • **JOB FAMILY** Customer Service

Director of Operations, Juarez, MX/Santa Teresa, NM
El Paso, TX, United States **and 1 more** (On-site) • **POSTING DATE** 08/11/2026 • **JOB FAMILY** Manufacturing
TRENDING

7. Further, Legrand has committed and continues to commit acts of patent infringement in this State, including by making, using, offering to sell, selling, and/or importing the products of accused of infringement herein into Texas. Legrand derives substantial revenue from its activities in this State and has purposefully established substantial, systematic and continuous contacts with this State and District such that it should reasonably expect to be haled into court in this State and District.

8. Venue is proper in this District under 28 U.S.C. § 1400(b) because Legrand has committed acts of patent infringement in this District and has a regular and established place of business in this District. Legrand North America, LLC's principal place of business is located at 2240 Campbell Creek Blvd., Suite 110, Richardson, TX 75208.

## RELEVANT FACTUAL BACKGROUND

### A. The Parties' Relationship

9. Ivani first filed suit against Legrand for infringement of the Asserted Patents on October 2, 2025. *See Ivani, LLC v. Legrand SA et al.*, 7:25-CV-00447 (W.D Tex.).

10. On March 31, 2026, Ivani voluntarily dismissed the case without prejudice as it assumed the parties would resolve the matter.

11. Since then, Legrand has failed to respond to Ivani's communications and meet during agreed upon times. Representative examples Legrand's conduct may be found below:

| Date | Ivani (through counsel) communication | Legrand (through counsel) Response |
|---|---|---|
| 4/27/2026 | "Ivani is available during the following times (CDT):..." | No response. |
| 4/30/2026 | "Has Legrand had a chance to consider the below dates?" | "Sorry, the delay here is on me. I missed your email. Glad you followed up. Will circle back." |
| 5/4/2026 | "Given some of the proposed dates are this week, I was hoping we could lock down a meeting time ASAP." | No response. |
| 5/6/2026 | I don't mean to be overly pushy here, but we need some clarity re: next steps. | "No worries. We're coordinating I'm the background and will circle back to you soon." |
| | | |
| 6/1/2026 | "I'm checking in re: our last call. Is Legrand able to send over the relevant information by the end of this week?" | No response. |
| 6/4/2026 | Just checking in here [regarding above]." | No response. |
| 6/9/2026 | Unfortunately, Ivani's sentiment is that the settlement dialogue has officially broken down. | "Legrand would like you to relay to Ivani that it is still interested in working toward the business relationship…I will also very genuinely caution that any resumption of litigation hostilities between the companies would make it highly unlikely that they could |

| | | |
|---|---|---|
| | | enter a business relationship.” |
| | | |
| 7/21/2026 | Next week on Wednesday, Thursday and Friday (July 29-31) are fairly open on our side…Feel free to send a meeting invitation at a convenient time for your team. | No response. |
| 7/28/2026 | “Checking back on possible dates for a call. Please let us know. Thanks.” | [7/29/2026] Would you please share your availability for next week so we can schedule a call? |
| 7/29/2026 | “Thanks for the update. Here is our availability next week (all times in CDT)…” | No response. |
| 8/11/2026 | “Just checking if you were able to confirm a call with the Legrand team on Aug. 18. Also, it would be helpful if we can get a marked up draft of the term sheet in advance of the call. Thanks.” | [8/17/2026] “Apologies for the delay. I’m working on a firm date for the call and some more guidance on the term sheet. Will circle back asap.” |
| 08/24/2026 | “Any progress on the Legrand end? As explained in our call a few weeks ago, we’re going to need to see progress on these discussions. We had provided a term sheet on July 20. I would think that having an initial call with the Legrand team to discuss that term sheet would have happened within a month. Our goal is to get a discussion going with a regular cadence to identify and work through any issues standing in the way of a deal. Can we plan for a call this week or next week? Thanks.” | No response. |
| 9/1/2026 | “Checking in on status. We would very much like to get substantive discussions going. Any reason for the delay on the Legrand end? Thanks.” | [9/2/2026] “Thanks for reaching out. Would you please give us some availability on 9/9 and 9/10 for a meeting?” |
| 9/2/2026 | “Here are the times that we are available on 9/9 and 9/10 (all times in CDT)…” | No response. |
| 9/9/2026 | “Any chance of a call tomorrow? If not then it looks like this will get pushed off by another week which is unfortunate as we would very | [9/10/2026] Let’s meet on Wednesday. How is 1:30 CT for you? Let me know if another time works better. |

| | | |
|---|---|---|
| | much like to see if a negotiated deal is possible. Thanks." | |

12. Therefore, any effort by Legrand to resolve this matter was conducted for the purpose of inducing delay and negates any contention by Legrand of undue delay on Ivani's part in bringing this action.

**B. The Asserted Patents**

13. On December 12, 2017, the United States Patent and Trademark Office ("USPTO") duly and legally issued U.S. Patent No. 9,843,194 ("the '194 Patent"), entitled "Configurable Mesh Network for an Electrical Switching System." A true and correct copy of the '194 Patent is attached hereto as **Exhibit 1**.

14. On September 17, 2019, the USPTO duly and legally issued U.S. Patent No. 10,418,824 ("the '824 Patent"), entitled "Configurable Mesh Network for an Electrical Switching System." A true and correct copy of the '824 Patent is attached hereto as **Exhibit 2**.

15. The technology disclosed in the Asserted Patents relates to systems for a mesh network which can be used in conjunction with the existing electrical infrastructure in a building to provide for additional control and functionality to devices utilizing the electrical infrastructure. Specifically, it relates to retrofitted or replacement electrical switches which can replace traditional switches and operate remotely through an internal wireless communication system or which can be used to create a new network from scratch.

16. By way of representative example, the '194 Patent claims a **master switch (Fig. 1)** configured to replace a traditional light switch, **and a remote switch (Fig. 2)**:




FIG. 1




FIG. 2

17. The master switch includes a "first activation object"—such as a paddle or capacitive touch plate—that a user may interact with to adjust a physical switch on board the master switch. The physical switch—such as an SPDT relay—acts to provide electricity flow from existing electrical infrastructure.

18. The master switch additionally includes a network communication system that receives instructions from a network and provides them to a computer onboard the master switch. Upon receipt of the instruction, the computer will adjust the configuration of the physical switch, thus allowing or disallowing electricity flow.

19. The remote switch is separate and independent from the master switch and thus includes a second activation object.

20. Like the master switch, the remote switch also includes a network communication system. The remote switch network communication system provides instructions to the master switch network upon activation of the second activation object. The instruction instructs the computer onboard the master switch to control the master switch's physical switch, thus allowing or disallowing electricity flow:




FIG. 4

21. The technology disclosed in the Asserted Patents was not routine or conventional. The USPTO examined the patented technology and concluded that no prior art, alone or in combination, disclosed or rendered obvious any of the claims of the Asserted Patents.

22. Ivani owns all rights, title, and interest in the Asserted Patents.

**B. The Infringing Master Switches**

23. Legrand makes, uses, offers for sale, sells, and imports multiple products that comprise a "master switch" under each of the Asserted Patents.

24. For example, the WNRL50[1] includes a first activation object in the form of a paddle:

[1] WNRL50"—and similar alphanumeric strings referenced herein—is the product identifier Legrand utilizes to identify this particular master switch.



25. The WNRL50 includes a physical switch configured to connect and disconnect an outlet to a power source:



26. The WNRL50 includes a computer configured to control said physical switch. As shown below in orange, the WNRL50 includes a microcontroller (the Atmel® | SMART™ SAM R21) connected to the physical switch (shown in yellow). The microcontroller controls said physical switch via header pins (shown in purple):




27. The Atmel® | SMART™ SAM R21 is a series of low-power microcontrollers using the 32-bit ARM® Cortex®-M0+ processor with an integrated ultra-low power 2.4GHz ISM band transceiver. The transceiver is integrated into a computer and receives instructions from a network.

28. The WNRL50 computer will adjust a configuration of the physical switch upon receipt of an instruction from said first network communication system. For example, a user may adjust the physical switch via an isolated remote switch:

| **User activates remote switch →** | **Lights dim / turn off** |
|---|---|
|  |  |

29. Additionally, users may activate the first activation object of the master switch itself, thus causing the first computer to adjust a configuration of said physical switch:

| User activates first activation object → | Lights dim / turn off |
| --- | --- |
|  |  |

30. In addition to the WNRL50, Legrand makes, uses, offers for sale, sells, and imports various other products that comprise a "master switch" under the Asserted Patents. For example, at least the WNAL50, WNRL10, WNAL10, WNP10, WNP20, WNRR20, WNAR203, WNRR15, WNAR153 (collectively, the "Master Switch Products") are each a "master switch" under the Asserted Patents.

**C. The Infringing Remote Switches**

31. Legrand also makes, uses, offers for sale, sells, and imports multiple products that comprise a "remote switch" under the Asserted Patents.

32. For example, the WNRL23—a battery operated (wireless) remote switch—includes a second activation object:



33. The WNRL23 includes a network communication system configured to provide instructions to a master switch upon activation of the second activation object. For example, a user may activate the second activation object of the WNRL23, thus causing the computer onboard an associated master switch to adjust the configuration of a physical switch.

34. In addition to the WNRL23, Legrand makes, uses, offers for sale, sells, and imports various other products that comprise a "remote switch" under the Asserted Patents. For example, the WNAL23, WNRL63, WNAL63, 064875, WNRL24, WNAL24M WNRL64, WNAL64, WNAL33, WNRL33, WNAL43, WNRL43, WNACB40, WNRCB40, and 067695 products are each a "remote switch" under the Asserted Patents.

35. Further, Legrand makes, uses, offers for sale, sells, and imports various "kits" that include a master switch and a remote switch. For example, the WNRH10KIT includes a master switch (green) and a remote switch (blue):



36. In addition to WNRH10KIT, Legrand makes, uses, offers for sale, sells, and imports various other kits that include both a master and remote switch. For example, the WNAH10KIT, WNREZK10, WNREZK15, WNREZK50, WNRKH10, WNRH15KIT, WNRKH53, and WNRKH532 each include a "master switch" and a "remote switch."

**D. Additional Infringing Switches**

37. In addition to the products identified above, Legrand makes, uses, offers for sale, sells, and imports lighting-control products under its Wattstopper® brand. These include products in Legrand's Wattstopper Digital Lighting Management ("DLM") wireless system and its Wattstopper PLUS wireless system. The products comprise a "master switch" and a "remote switch" under the Asserted Patents.

38. For example, the Wattstopper DLM Wireless Room Controller, model LMRC-611MCC, and its antenna variant, model LMRC-611MCC-A (together, the "LMRC-611MCC"), are each a master switch.

39. The LMRC-611MCC includes a first activation object in the form of a "Load A" button located on the device itself. Legrand's documentation explains that a user can operate the

connected load locally with the Load button: "press and release for ON/OFF, press and hold to dim."

40. The LMRC-611MCC includes a physical switch: a 10-amp relay rated for ballast, LED, and incandescent loads. The relay connects the controlled load to, and disconnects it from, the building's line-voltage power source.

41. The LMRC-611MCC includes a network communication system that receives instructions from a network. It communicates over a 2.4 GHz 6LoWPAN wireless mesh network. The product label identifies an integrated radio module with FCC ID Q4B-P2.

42. The LMRC-611MCC includes a computer configured to control the physical switch. On information and belief, the LMRC-611MCC contains a processor or microcontroller. That processor receives instructions from the onboard radio and from the local Load button, and it drives the relay in response. A computer is needed for the LMRC-611MCC to work as Legrand documents it. The device switches its relay (i) when a user presses its Load button and (ii) when it receives wireless instructions from other DLM devices over the mesh network. It also measures power drawn by the connected load and reports that data over the network. Doing all of this requires onboard processing that decodes network messages and controls the relay.

43. The LMRC-611MCC's computer changes the configuration of the physical switch (i.e., opens or closes the relay) when it receives an instruction from its network communication system, such as a command sent by a DLM wireless wall switch. The computer also changes the configuration of the physical switch when a user activates the first activation object, the Load A button.

44. On information and belief, Legrand has made, used, offered for sale, sold, and/or imported the LMRC-611MCC since at least September 2018, when it appeared in Legrand's Wireless DLM brochure.

45. The Wattstopper DLM Wireless Room Controller, model LMRC-611-16M, is likewise a master switch. Legrand's product label calls the LMRC-611-16M a "Wireless Single Relay Room Controller." It includes a first activation object (a "Load A" button). It includes a physical switch (a relay rated for 16-amp ballast loads) and a 0–10V dimming output. It includes a network communication system that uses the same DLM wireless mesh architecture as the LMRC-611MCC, and its label carries an FCC ID. On information and belief, it also includes a computer that controls the relay in response to network instructions and to activation of the Load button, for the same reasons described above for the LMRC-611MCC.

46. The Wattstopper DLM Wireless Plug Load Controller, model LMPL-611-20M, is likewise a master switch. Legrand's product label calls the LMPL-611-20M a "Wireless Plug Load Controller, Power Metering." It includes a first activation object (a "Load A" button that a user can press to control the connected load locally). It includes a physical switch (a relay rated for a 20-amp duplex-receptacle load) that connects and disconnects an outlet to a power source. According to Legrand's specification sheet, it includes a network communication system that communicates over a "self formed wireless IPv6 mesh network." Its label identifies an integrated radio module with FCC ID Q4B-P3. On information and belief, the LMPL-611-20M also includes a computer that opens and closes the receptacle relay (i) in response to instructions received over the DLM mesh network and (ii) in response to activation of the Load button.

47. The LMRC-611MCC, LMRC-611-16M, and LMPL-611-20M (collectively, the "Additional Master Switch Products") are each a "master switch" under the Asserted Patents.

48. Legrand also makes, uses, offers for sale, sells, and imports Wattstopper-branded products that comprise a “remote switch” under the Asserted Patents.

49. For example, the Wattstopper DLM Wireless Wall Switches, models LMSW-610-S, LMSW-611-S, LMSW-622-S, LMSW-632-S, and LMSW-641-S (collectively, the “LMSW Wireless Switches”), are remote switches:

50. Each LMSW Wireless Switch includes a second activation object in the form of one or more push buttons that a user presses to turn a load on or off, to dim it, or to select a scene.

51. Each LMSW Wireless Switch includes a network communication system configured to provide instructions to a network. Legrand's specification sheet lists the LMSW Wireless Switches' “Connection to DLM Network” as “Wireless IPv6 Mesh.”

52. The LMSW Wireless Switches do not include a physical switch configured to connect and disconnect an outlet to a power source. They run on a coin-cell battery (CR2032) and are not wired to line-voltage power.

53. When a user activates the second activation object of an LMSW Wireless Switch, its network communication system sends an instruction over the DLM wireless mesh network. The instruction tells the computer onboard the associated master switch (for example, an LMRC-611MCC, LMRC-611-16M, or LMPL-611-20M) to control that device's physical switch, i.e., to open or close its relay.

54. Likewise, the Wattstopper PLUS Wireless Slim Switches, models EN-SW-11-ZB, EN-SW-20-ZB, EN-SW-22-ZB, EN-SW-41-ZB, and EN-SW-50-ZB, in all color and finish variants (collectively, the “Slim Switches”), are remote switches.

55. Each Slim Switch includes a second activation object in the form of one or more push buttons. Legrand describes the Slim Switches as “programmable, low voltage devices for manual

on/off, dimming, and scene control of one or more loads from one or more locations," and states that the "[s]witches may be used for multi-way control."

56. Each Slim Switch includes a network communication system configured to provide instructions to a network. Legrand's specification sheet lists the Slim Switches' "Wire Connection Type" as "Wireless" and their "Topology" as "Wireless Mesh." They communicate over a 2.4 GHz Zigbee wireless mesh network through a radio certified under FCC ID Q4B-ZBSD.

57. The Slim Switches do not include a physical switch configured to connect and disconnect an outlet to a power source. They run only on a battery (CR2354, 3 VDC).

58. When a user activates the second activation object of a Slim Switch, its network communication system sends an instruction over the Wattstopper PLUS wireless mesh network. The instruction tells the computer onboard an associated relay-bearing Wattstopper PLUS load controller to control that controller's physical switch and thereby switch or dim the connected load.

59. The LMSW Wireless Switches and the Slim Switches (collectively, the "Additional Remote Switch Products") are each a "remote switch" under the Asserted Patents.

60. Legrand designs, markets, and sells the Additional Master Switch Products and the Additional Remote Switch Products to be installed and operated together as a single wireless power control system. When an Additional Remote Switch Product is paired with an Additional Master Switch Product (or, for the Slim Switches, with a Wattstopper PLUS load controller), the resulting installation is a power control system for retrofitting into a structure. That system includes a master switch and a remote switch, as recited in claim 1 of each of the Asserted Patents.

61. These systems also practice additional claims of the Asserted Patents.

62. The Additional Remote Switch Products have no substantial non-infringing use. They contain no relay and cannot switch any load themselves. Their only function is to send instructions

over a wireless mesh network to a relay-bearing master switch, which then operates its physical switch. Legrand's own statement that a "Load Controller [is] Required" confirms this. Likewise, the wireless network communication system of each Additional Master Switch Product exists to let the device's relay be controlled by instructions received from other devices, including wireless remote switches, over the mesh network.

63. Legrand also actively induces infringement. Its specification sheets, installation manuals, and brochures tell customers and installers to pair the Additional Remote Switch Products with the Additional Master Switch Products and other Legrand load controllers. They also tell customers and installers how to configure multi-way control of a load from one or more wireless switches. Customers who install and operate these products as Legrand instructs directly infringe the Asserted Patents.

**E. Legrand's Willful Infringement**

64. In or around June 2015, Ivani and Legrand engaged in business development conversations. On June 4, 2015, Ivani's Chief Marketing Officer emailed a Legrand Vice President, Mr. Peter Horton:

> I trust this message finds you well. In an effort to share more relevant information with you without a signed NDA, we had an idea. **We'd like to send you our utility patent filing for your review**. There are technologies behind the patent that go further towards providing value not currently available on the market, and this can be saved for further discussions while under an NDA. That said, we would like to disclose it as "commercial in confidence," that is that it not be disclosed to 3rd parties outside of Legrand.

65. Mr. Horton responded:

> **I am in agreement that this makes sense to continue our conversation**. I will keep this information in confidence and will advise where it is shared internally. In the short term, I will be the only one reviewing the information.

66. Thus, on June 12, 2015, Ivani's Chief Marketing Officer sent the '194 Patent application to Legrand, writing, "**Please find the utility patent filing attached**. I look forward to hearing your thoughts."

67. Following Ivani's initial correspondence with Legrand, Ivani executives attended several in-person meetings with Legrand personnel. For example, on November 10, 2016, Legrand's current CEO, Justin McKinney attended the "Eliot Event" in New York, New York. The following Legrand personnel attended the event: John Seldorff, Steve Schoffstall, Fritz Werder, Brian Dibella, Ken Ruh, and Mr. Peter Horton. The purpose of the Eliot Event was an unveiling of Legrand "smart ecosystem" as well as the partners they were working with at the time. Ivani was one of those partners.

68. During the Eliot Event, Mr. Mckinney introduced Ivani's "sensify" product to the aforementioned individuals. Today, Philips Hue owner, Signify, licenses the patented sensify technology that the Verge calls, "the tech that could turn millions of Zigbee light bulbs into motion sensors with a single update."

69. On July 25, 2017, Ivani executives met with Legrand in Legrand's Harrisburg, Connecticut office to further demonstrate sensify.

70. On October 12, 2017, Ivani executives met with Legrand at Legrand's international headquarters in Limoges, France. Ivani again demonstrated sensify.

71. On January 9, 2018, Ivani executives met with Legrand at the Consumer Electronics Show (commonly referred to as "CES") in Las Vegas, Nevada. Ivani again demonstrated sensify and discussed the future of sensify technology integrated into Legrand hardware. By this point, the '194 Patent had been issued. Ivani was a featured speaker in the Legrand booth at this show and met directly with the CEO of Legrand for ongoing business discussions.

72. On March 13, 2018, Ivani executives again met with Legrand in Legrand's Harrisburg, Connecticut office to discuss sensify.

73. And finally, on October 15, 2018, at Legrand's request, Ivani executives dropped off sensify demonstration kits at Legrand's international headquarters.

74. Thus, since at least 2015, Legrand has been aware of Ivani and its intellectual property.

**COUNT I**
**Infringement of U.S. Patent No. 9,843,194**

75. Ivani realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

76. Ivani owns all rights, title, and interest in the '194 Patent, entitled, "Configurable Mesh Network for an Electrical Switching System.

77. Legrand makes, uses, offers for sale, sells, and imports certain master switches (the "Infringing Master Switches" and "Additional Master Switch Products") that comprise a "master switch" under each of the Asserted Patents, including the '194 Patent. For example, at least the WNRL50, WNAL50, WNRL10, WNAL10, WNP10, WNP20, WNRR20, WNAR203, WNRR15, WNAR153, LMRC-611MCC, LMRC-611-16M, and LMPL-611-20M products include a first activation object; a physical switch configured to connect and disconnect an outlet to a power source; a computer configured to control said physical switch; and a network communication system configured to receive instructions from a network and provide them to said computer. Further, the computer onboard Infringing Master Switches will adjust a configuration of said physical switch upon receipt of an instruction from a network communication system or activation of said first activation object.

78. The Infringing Master Switches and Additional Master Switch Products have no substantial non-infringing use. They are designed and intended for use in practicing the invention

claimed in the '194 Patent and are not staple articles suitable for substantial non-infringing use. By way of example, Legrand advertises that the WNRL50 should be "pair[ed] with a radiant Wireless Smart Dimmer with Netatmo [i.e., a remote switch] to gain easy 3-way control."

79. Legrand has had notice of the '194 Patent since at least its issue date on December 12, 2017.

80. Yet Legrand has been and is contributing to the infringement of the '194 Patent by selling or offering to sell the Infringing Master Switches and Additional Master Switch Products knowing them to be specially made or adapted for practicing the invention of the '194 Patent and not a staple article suitable for substantial non-infringing use, in violation of 35 U.S.C. § 271(c).

81. Legrand makes, uses, offers for sale, sells, and imports certain remote switches (the "Infringing '194 Remote Switches" and "Additional Remote Switch Products") that comprise a "remote switch" under '194 Patent. For example, at least the, WNRL23, WNAL23, WNRL63, WNAL63, 064875, WNRL24, WNAL24M WNRL64, WNAL64, WNAL33, WNRL33, WNAL43, WNRL43, WNACB40, WNRCB40, and 067695, LMSW Wireless Switches, and Slim Switches products include a second activation object; a network communication system configured to provide instructions; and no physical switch configured to connect and disconnect an outlet to a power source. Further, the network communication system on board the Infringing '194 Remote Switches will provide an instruction to the network on the master switch upon activation of a second activation object—said instruction instructing the computer onboard the master switch to control the physical switch of the master switch.

82. The Infringing '194 Remote Switches and Additional Remote Switch Products have no substantial non-infringing use. They are designed and intended for use in practicing the patented invention of the '194 Patent and are not staple articles suitable for substantial non-infringing use.

By way of example, Legrand advertises that customers should "[p]air this battery-operated smart light switch [WNRL23] with a radiant Smart Switch with Netatmo."

83. Legrand has had notice of the '194 Patent since at least its issue date on December 12, 2017.

84. Yet Legrand has been and is contributing to the infringement of the '194 Patent by selling or offering to sell the Infringing '194 Remote Switches and Additional Remote Switch Products knowing them to be specially made or adapted for practicing the invention of the '194 Patent and not a staple article suitable for substantial non-infringing use, in violation of 35 U.S.C. § 271(c).

85. Legrand additionally makes, uses, offers for sale, sells, and imports "kits" that include a master switch and a remote switch. For example, Legrand sells at least the following Infringing Kits: WNAH10KIT, WNREZK10, WNREZK15, WNREZK50, WNRKH10, WNRH15KIT, WNRKH53, and WNRKH532.

86. The Infringing Kits practice each limitation of claim 1 of the '194 Patent and thus directly infringe the '194 Patent.

87. Legrand's direct infringement has been, and continues to be knowing, intentional, and willful.

88. Legrand also knowingly and intentionally induces infringement of claims of the '194 Patent in violation of 35 U.S.C. § 271(b). Legrand has had knowledge of the '194 Patent and the infringing nature of the Infringing Kits since at least as the Patent's issue date on December 12, 2017. Despite this knowledge of the '194 Patent, Legrand continues to actively encourage and instruct its customers and end users (for example, through online instruction materials on its website) to use the Infringing Kits in ways that directly infringe the '194 Patent. Legrand does so, knowing and intending that its customers and end users will commit these infringing acts. Legrand

also continues to make, use, offers for sale, sell, and import the Infringing Kits, despite its knowledge of the '194 Patent, thereby specifically intending for and inducing its customers to infringe the '194 Patent through the customers' normal and customary use of the Infringing Kits.

**COUNT II**
**Infringement of U.S. Patent No. 10,418,824**

89. Ivani realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

90. Ivani owns all rights, title, and interest in the '824 Patent, entitled, "Configurable Mesh Network for an Electrical Switching System.

91. Legrand makes, uses, offers for sale, sells, and imports certain master switches (the "Infringing Master Switches" and "Additional Master Switch Products") that comprise a "master switch" under each of the Asserted Patents, including the '824 Patent. For example, at least the WNRL50, WNAL50, WNRL10, WNAL10, WNP10, WNP20, WNRR20, WNAR203, WNRR15, WNAR153, LMRC-611MCC, LMRC-611-16M, and LMPL-611-20M products include a first activation object; a physical switch; a computer configured to control said physical switch; and a network communication system configured to receive instructions from a network and provide them to said computer. Further, the computers on board Infringing Master Switches will adjust a configuration of said physical switch upon receipt of an instruction from said first network communication system or activation of said first activation object.

92. The Infringing Master Switches and Additional Master Switch Products have no substantial non-infringing use. They are designed and intended for use in practicing the invention claimed in the '824 Patent and are not staple articles suitable for substantial non-infringing use. By way of example, Legrand advertises that the WNRL50 should be "pair[ed] with a radiant Wireless Smart Dimmer with Netatmo [i.e., remote switch] to gain easy 3-way control."

93. Legrand has had notice of the ‘194 Patent since at least its issue date on December 12, 2017. The ‘824 Patent is a continuation of the ‘194 Patent. Thus, on information and belief, Legrand has had notice of the ‘824 Patent since at least its issue date on September 17, 2019.

94. Yet Legrand has been and is contributing to the infringement of the ‘824 Patent by selling or offering to sell the Infringing Master Switches knowing them to be specially made or adapted for practicing the invention of the ‘824 Patent and not a staple article suitable for substantial non-infringing use, in violation of 35 U.S.C. § 271(c).

95. Legrand makes, uses, offers for sale, sells, and imports certain remote switches (the “Infringing ‘824 Remote Switches” and “Additional Remote Switch Products”) that comprise a “remote switch” under ‘824 Patent. For example, at least the, WNRL23, WNAL23, WNRL63, WNAL63, 064875, WNRL24, WNAL24M WNRL64, WNAL64, WNAL33, WNRL33, WNAL43, WNRL43, WNACB40, WNRCB40, 067695, WNAL10, WNAL50, WNRL10, and WNRL50, LMSW Wireless Switches, and Slim Switches products include a second activation object; and a network communication system configured to provide instructions. Further, the network communication systems on board the Infringing ‘824 Remote Switches will provide an instruction to said network upon activation of said second activation object, said instruction instructing said first computer to control said physical switch of said master switch.

96. The Infringing ‘824 Remote Switches Additional Remote Switch Products have no substantial non-infringing use. They are designed and intended for use in practicing the patented invention of the ‘824 Patent and are not staple articles suitable for substantial non-infringing use. By way of example, Legrand advertises that customers should “[p]air this battery-operated smart light switch [WNRL23] with a radiant Smart Switch with Netatmo.”

97. Legrand has had notice of the ‘194 Patent since at least its issue date on December 12, 2017. The ‘824 Patent is a continuation of the ‘194 Patent. Thus, on information and belief, Legrand has had notice of the ‘824 Patent since at least its issue date on September 17, 2019.

98. Yet Legrand has been and is contributing to the infringement of the ‘824 Patent by selling or offering to sell the Infringing ‘824 Remote Switches and Additional Remote Switch Products knowing them to be specially made or adapted for practicing the invention of the ‘824 Patent and not a staple article suitable for substantial non-infringing use, in violation of 35 U.S.C. § 271(c).

99. Legrand additionally makes, uses, offers for sale, sells, and imports “kits” that include a master switch and a remote switch. For example, Legrand sells at least the following Infringing Kits: WNAH10KIT, WNREZK10, WNREZK15, WNREZK50, WNRKH10, WNRH10KIT, WNRH15KIT, WNRKH53, and WNRKH532.

100. The Infringing Kits practice each limitation of claim 1 of the ‘824 Patent and thus directly infringe the ‘824 Patent.

101. Legrand’s direct infringement has been, and continues to be knowing, intentional, and willful.

102. Legrand also knowingly and intentionally induces infringement of claims of the ‘824 Patent in violation of 35 U.S.C. § 271(b). On information and belief, Legrand has had knowledge of the ‘824 Patent and the infringing nature of the Infringing Kits since at least as early the Patent’s issue date on September 17, 2019. Despite this knowledge of the ‘824 Patent, Legrand continues to actively encourage and instruct its customers and end users (for example, through online instruction materials on its website) to use the Infringing Kits in ways that directly infringe the ‘824 Patent. Legrand does so, knowing and intending that its customers and end users will commit these infringing acts. Legrand also continues to make, use, offer for sale, sell, and import the

Infringing Kits, despite its knowledge of the ‘824 Patent, thereby specifically intending for and inducing its customers to infringe the ‘824 Patent through the customers’ normal and customary use of the Infringing Kits.

**PRAYER FOR RELIEF**

WHEREFORE, Ivani respectfully requests that this Court enter:

a. A judgment in favor of Ivani that Legrand has directly infringed, actively induced infringement, and contributorily infringed each of the Asserted Patents, in violation of 35 U.S.C. § 271(a), (b), and (c).

b. A permanent injunction prohibiting Legrand from further acts of infringement of each of the Asserted Patents;

c. A judgment and order requiring Legrand to pay Ivani its damages, costs, expenses, and pre-judgment and post-judgment interest for its infringement of each of the Asserted Patents;

d. A judgement and order that the damages award be increased up to three times the actual amount assessed, under 35 U.S.C. § 284 due to Legrand’s willful infringement of each of the Asserted Patents;

e. A judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding to Ivani its reasonable attorneys’ fees against Legrand; and

f. Any and all other relief as the Court may deem appropriate and just under the circumstances.

**DEMAND FOR A JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Ivani requests a jury trial on all issues so triable.

Dated: October 22, 2026

Respectfully submitted,

*/s/David L. Hecht*
David L. Hecht* **(Lead Counsel)**
Texas Bar No. 24136516
dhecht@hechtpartners.com
Maxim Price
mprice@hechtpartners.com (*pro hac vice* forthcoming)
J. Tanner Murphy (*pro hac vice* forthcoming)
tmurphy@hechtpartners.com
HECHT PARTNERS LLP
125 Park Avenue, 25th Floor
New York, New York 10017
Telephone: (212) 851-6821

William D. Ellerman* **(Local Counsel)**
Texas Bar No. 24007151
Cherry Johnson Siegmund James PC
8140 Walnut Hill Lane, Suite 105
Dallas, Texas 75231

*Counsel for Plaintiff Ivani, LLC*

*Admitted in this District*